**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**Jerry FERGUSON, Appellant.**

Superior Court of Pennsylvania.

Submitted June 28, 2004.

Filed Dec. 21, 2004.

---

Ines M. Massella, Erie, for appellant.

Bradley H. Foulk, Asst. Dist. Atty., Erie, for Com., appellee.

Before: BENDER, KELLY, and JOHNSON, JJ.

JOHNSON, J.

¶ 1 Jerry Ferguson appeals from the judgment of sentence imposed following his conviction of aggravated assault and recklessly endangering another person. *See* 18 Pa.C.S. §§ 2702, 2705 (respectively). Ferguson claims that the trial court erred in allowing the Commonwealth to introduce evidence of which he had no pretrial notice to impeach a defense witness in violation of the disclosure mandate of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. Ferguson further claims that the jury's verdict was against the weight of the evidence. Because, *inter alia,* we do not find the disputed evidence constitutionally material, we conclude that the Commonwealth's failure to produce the disputed evidence prior to trial did not constitute a *Brady* violation. Accordingly, we affirm the judgment of sentence.

¶ 2 This matter arises out an assault by multiple perpetrators when one or more of them took offense to the victim's sarcastic response to a request for a cigarette. On the evening of August 26, 2002, victim Jason Cambra left his apartment to get bread, milk and snacks at the local Dairy Mart convenience store. After leaving the store, Cambra encountered Ferguson who, along with cohort Ricardo Jones and three others, were "hanging out" on the street. As Cambra walked past, one of them asked, "Yo, do you have a cigarette?" to which Cambra replied "Yo, I don't smoke." Finding Cambra's response offensive, Ferguson struck Cambra in the head, knocking him to the ground and, with the others, continued to punch and kick him until Cambra lay unconscious. Cambra suffered multiple compressed facial fractures requiring surgical repair. Due to the trauma he sustained, Cambra has no recollection of the attack.

¶ 3 At trial, the parties produced conflicting testimony to account for who participated in the beating. In its case-in-chief, the Commonwealth called Ferguson's cousin, Ricardo Jones, and an acquaintance, Sylvester Tate. Tate testified that he had been walking down an alley adjacent to the Dairy Mart when he saw Cambra walking near a group of five young men, including Ferguson and Jones. Tate saw Ferguson speak to Cambra and then strike him in the face, causing him to fall to the ground. Tate testified that the group of men then kicked Cambra for a couple of minutes while he lay unconscious.

¶ 4 The Commonwealth next offered the testimony of Paul Davis. Davis stated that he was present at Chrisandra's bar, located across the street from the Dairy Mart. As he exited the bar, Davis observed

a "white person" and a "black dude" talking loudly near a group of young men. The white man then began to walk away when one of the young men, who Davis recognized as Chaz Mathis, hit him "from the blind side." Davis further stated that Ferguson was present and kicked the man repeatedly. Davis also testified that Jones participated in the attack.

¶ 5 Ferguson called Ricardo Jones, his cousin, who testified that he alone encountered Cambra outside of the Dairy Mart as he walked to his grandmother's house to meet Ferguson. Jones testified that it was he who approached Cambra and asked for a cigarette and then punched him in the head. Jones stated further that after Cambra fell to the ground, he "got on top of" him and beat him. As a result of this incident, Jones pled guilty to charges against him.

¶ 6 After Ferguson's counsel finished his direct examination of Jones, the Commonwealth introduced a letter Jones had written to the police stating that he was innocent of the beating and that Sylvester Tate and Chaz Mathis were the responsible parties. At sidebar, defense counsel objected, stating that he had no previous knowledge of the letter and that the Commonwealth's impromptu submission amounted to "being ambushed here with information I don't have a copy of, I know nothing about." The court granted a ten minute recess for counsel to read the letter.

¶ 7 When the proceedings resumed, the Commonwealth stated for the record its reasons for not disclosing the letter at a previous time. The Commonwealth avowed that it had received the evidence from the police department only two days prior and "did not give [the letter] much attention at the time." During Jones' testimony, a police detective gave a copy of the letter to the Commonwealth, prompting its presentation to the court. Defense counsel countered that the Commonwealth's tardy disclosure was a discovery violation .in light of his timely discovery request and the Commonwealth's ongoing responsibility to disclose any inculpatory or exculpatory information. Counsel further stated that he would not have called Jones to testify or would have done so only upon Ferguson's own introduction of the prior inconsistent statements made in the letter to ensure that Jones could maintain credibility in light of the apparent conflicting evidence.

¶ 8 The court overruled Ferguson's objections and admitted the letter into evidence, reasoning that Ferguson had the opportunity to interview Jones prior to his taking the stand and should have ascertained whether such evidence existed at that time. Following the court's ruling, the Commonwealth cross-examined Jones. In his testimony, Jones admitted to writing the letter stating his own innocence and implicating others in order to escape punishment. Jones further stated that the allegations he made in the letter were false and after realizing his error in lying, he confessed to beating Cambra. Despite his previous fabrication, Jones maintained that his testimony was true and was not influenced by his familial relationship with Ferguson.

¶ 9 On September 12, 2003, the jury convicted Ferguson of aggravated assault and recklessly endangering another person. On September 23, Ferguson filed a motion for a new trial based upon the nondisclosure of Jone's letter by the Commonwealth. The court denied the motion and subsequently sentenced Ferguson to ten to twenty years' incarceration. Thereafter, Ferguson filed the instant appeal raising two questions for our review:

    A.  Is the appellant entitled to a new trial under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d

215, 83 S.Ct. 1194 (1963), and its progeny where the Commonwealth failed to provide to defense counsel information which it had in its possession that was favorable to the accused and material to the question of guilt?

B. Was the verdict against the weight of the evidence where a third party testified to his responsibility for the injuries to the victim, the victim could not identify Appellant as his assailant, and the Commonwealth presented no testimony to corroborate that [Ferguson] caused the injuries.

Brief for Appellant at 4 (some capitalization removed).

¶ 10 Ferguson's first question challenges the trial court's exercise of discretion in allowing the letter written by Jones into evidence when the Commonwealth failed to disclose the letter prior to trial. Ferguson argues that because the letter inculpated two assailants other than the defendant and contradicted the witness's admission that he himself had assaulted the victim, it is exculpatory of the defendant and might have prompted a change in defense strategy had it been produced prior to the witness's testimony. Brief for Appellant at 11. He concludes accordingly that its admission violated both *Brady* and Pennsylvania Criminal Rule 573, which effectively codifies the *Brady* rule. We conclude that, under the circumstances of this case, the letter is not exculpatory and therefore is not "constitutionally material" within the meaning of the *Brady* line of cases. Accordingly, the Commonwealth's failure to disclose it, although regrettable, does not constitute a denial of due process under the Fourteenth Amendment or a cognizable violation of Rule 573.

¶ 11 Rule 573 requires that the Commonwealth "shall disclose to the defendant's attorney all … evidence favorable to the accused that is material either to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth." Pa.R.Crim.P. 573(B)(1)(a). Similarly, *Brady* provides that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment[.]" 373 U.S. at 87, 83 S.Ct. 1194. In this context, however, the term "material" has been variously defined, expanded and, ultimately, consolidated in a manner that appears to narrow its reach. *See generally U.S. v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *see also Strickler v. Greene*, 527 U.S. 263, 296–301, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (Souter, J., concurring and dissenting); *U.S. v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

¶ 12 This evolving definition is crucial to the disposition of cases such as this one, where the evidence withheld by the Commonwealth, although of significance in pretrial planning by the defense, is of limited value in impeaching the verdict. Initially, the United States Supreme Court defined materiality with reference to the form and extent of the defendant's request for disclosure. *See Agurs*, 427 U.S. at 103–07, 96 S.Ct. 2392. Hence, whether counsel had made a specific request, general request, or no request at all assumed controlling significance in determining the extent to which the evidence not disclosed was constitutionally material. *See Agurs*, 427 U.S. at 103–07, 96 S.Ct. 2392 (prescribing standards of materiality based on specificity of defense request for disclosure). Evidence the defendant had specifically requested that the prosecution then failed to produce

was adjudged by a different measure of materiality than evidence withheld where the defendant had not requested disclosure. *See id.* More recently, however, the Court consolidated the definition, allowing only tacit recognition of the nature of the defendant's request. *See Bagley,* 473 U.S. at 682, 105 S.Ct. 3375 (citing *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052).

> We find the *Strickland* formulation of the *Agurs* test for materiality sufficiently flexible to cover the "no request," "general request," and "specific request" cases of prosecutorial failure to disclose evidence favorable to the accused: *The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.*

*Id.* (emphasis added). The Court further defined reasonable probability as "a probability sufficient to undermine confidence in the outcome." *Id.*

■ ¶ 13 In the wake of *Bagley,* the Supreme Court of Pennsylvania continued to draw the earlier distinctions based on the specificity of the defendant's request for disclosure only for a limited time. *See Commonwealth v. Green,* 536 Pa. 599, 640 A.2d 1242 (1994) (applying *Agurs* standard of materiality based on general request for disclosure); *Commonwealth v. Moose,* 529 Pa. 218, 602 A.2d 1265 (1992) (same); *but see Commonwealth v. Santiago,* 405 Pa.Super. 56, 591 A.2d 1095, 1115–17 (1991) (recognizing and applying *Bagley* standard). More recently, however, our Supreme Court has relied consistently on the consolidated standard in *Bagley,* without reference to the form of the original request for disclosure. *See Commonwealth v. Chambers,* 570 Pa. 3, 807 A.2d 872, 887 (2002) (quoting *Bagley* standard of materiality); *Commonwealth v. Simmons,* 569

Pa. 405, 804 A.2d 625, 636–37 (2001) (same); *Commonwealth v. Paddy,* 569 Pa. 47, 800 A.2d 294, 305–06 (2002) (same); *Commonwealth v. Burke,* 566 Pa. 402, 781 A.2d 1136, 1141 (2001) (same); *Commonwealth v. Strong,* 563 Pa. 455, 761 A.2d 1167, 1174 (2000) (same); *see also Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726, 730 (2002) (citing *Paddy*). Although the Court has not expressly disavowed the standard in *Agurs,* on which Ferguson impliedly relies, Brief for Appellant at 16 (citing *Moose, supra*), its current application of the standard in *Bagley* suggests its adoption of the standard *sub silentio.* We conclude, accordingly, that the standard of materiality enunciated in *Bagley* applies to all *Brady* claims raised in Pennsylvania. Thus, in the context of pre-trial disclosure, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." 473 U.S. at 682, 105 S.Ct. 3375.

■ ¶ 14 Nevertheless, regardless of the caselaw cited, one precept has remained constant: "If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial." *Green,* 640 A.2d at 1245 (quoting *Agurs,* 427 U.S. at 112–13, 96 S.Ct. 2392). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." *Chambers,* 807 A.2d at 887. Rather, "material evidence" must be favorable to the accused "so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Santiago,* 591 A.2d at 1117 (quoting *Bagley,* 473 U.S. at 676, 105 S.Ct. 3375).

■ ¶ 15 Applying this standard to the facts of this case, we find no basis for the

award of a new trial that Ferguson requests. The proffered impeachment evidence on which the defendant relies is not sufficiently favorable, and its suppression was not sufficiently prejudicial, to satisfy the constitutional threshold of materiality. This is so because the evidence fails entirely to discredit any of the eyewitness testimony upon which Ferguson's conviction is based. Notwithstanding changes in trial strategy defense counsel may have made in light of Jones's letter to avoid or ameliorate the resulting injury to his credibility, direct evidence legally sufficient to sustain Ferguson's conviction would remain unchanged. That evidence establishes beyond any reasonable doubt that Ferguson was one of a group of perpetrators who brutally assaulted Jason Cambra in broad daylight in view of two sworn eyewitnesses. This distinction is critical, for unlike the scenario in *Green* on which Ferguson relies heavily, Ferguson's conviction was not based merely on circumstantial evidence. *See* 640 A.2d at 1245 (finding material undisclosed statements suggesting guilt of third party where defendant's trial did not include eyewitness testimony and defendant's conviction was based solely on circumstantial evidence and inferences).

¶ 16 The evidence in this case is, by contrast, much more substantial. Sylvester Tate, who had been Ferguson's best friend since the two were in first grade, N.T., 9/11/03, at 92, stood only several yards away, watching as the melee began, N.T. 9/11/03, at 100. He gave a detailed account of what happened, recalling that Jerry Ferguson and Ricardo Jones were among a group of four teenagers who challenged the victim as he walked down the street carrying groceries. N.T., 9/11/03, at 97–99. He heard Ferguson say something to the victim as he passed and then saw him hit the victim in the head with sufficient force that he collapsed to the ground

without even a chance to exchange blows. N.T., 9/11/03, at 100–01. Tate continued to watch as all of the youths, Ferguson still among them, began to kick and stomp the victim all over his body. N.T., 9/11/03, at 101–02, 116. Tate's testimony remained consistent, unshaken even on cross-examination, N.T., 9/11/03, at 111–15.

¶ 17 Similarly, eyewitness Paul Davis also recalled the melee, confirming that Ferguson joined in kicking and stomping the victim as he lay on the pavement. N.T., 9/12/03, at 7. Although his recollection of the first blow, which he said was struck by another member of the group, N.T., 9/12/03, at 6, varied from Tate's recollection, it established nonetheless that Ferguson had been one of the victim's assailants. Although this variation might assume greater significance had the offense arguably been committed by only a single assailant, the evidence here is overwhelming that the offense was committed by at least four people. Hence, Davis's recollection that someone other than Ferguson struck the first blow does little to detract from the evidence, on which both witnesses agreed, that Ferguson participated in an aggravated assault upon the victim. Indeed, the eyewitnesses' testimony did not vary on that point. Unlike the verdict in *Green*, based on circumstantial evidence and subject to question based on a co-defendant's "jailhouse" admission, the verdict here is grounded on the testimony of eyewitnesses, both of whom attested to Ferguson's role in the assault. Regardless of whether the defense had chosen to call Ricardo Jones to attest to his own role in the assault, *his testimony of his own involvement would not negate the testimony of the Commonwealth's witnesses that Ferguson too was involved.* Accordingly, the fact that Jones's credibility could be called into question based on a letter not disclosed to the defense cannot be deemed so

critical as to show "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375 (citing *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052); nor can it be said to "make the difference between conviction and acquittal." *Santiago*, 591 A.2d at 1117 (quoting *Bagley*, 473 U.S. at 676, 105 S.Ct. 3375).

¶ 18 Because we do not find Jones's letter sufficient to yield so great a difference, even if disclosed, we cannot find it "material" within the meaning of *Brady* and its progeny. Consequently, we find no due process violation and no ground on which to grant a new trial. Although we do not condone the apparent lack of diligence that prompted the Commonwealth's nondisclosure, we do not find it a sufficient reason on which to grant a new trial. *See Green*, 640 A.2d at 1245 (quoting *Agurs*, 427 U.S. at 112–13, 96 S.Ct. 2392) ("If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.").

¶ 19 In Ferguson's second question, he challenges the verdict as against the weight of the evidence. We note, however, that in order to prevail on such a claim, an appellant must first preserve the underlying issue before the trial court pursuant to Rule 607 of the Pennsylvania Rules of Criminal Procedure. Pa. R.Crim.P. 607 Comment ("The purpose of this rule is to make it clear that a challenge to the weight of the evidence must be raised with the trial judge or it will be waived."). In his motion for a new trial, Ferguson failed to raise this claim, nor does he cite to any passage of the record demonstrating that he raised the issue during trial. *See* Pa.R.Crim.P. 607(A)(1), (2). Therefore, we find this claim to be waived and decline to consider it further.

¶ 20 For the foregoing reasons, we affirm the judgment of sentence.

¶ 21 Judgment of sentence **AFFIRMED**.

¶ 22 BENDER, J., files a Dissenting Opinion.

BENDER, J., dissenting:

¶ 1 Were this a case of the Commonwealth's non-disclosure of exculpatory evidence that Appellant discovered after conviction and sentencing, then I would agree with the Majority that the relative character of the evidence we are considering here is not constitutionally material and would not impeach the verdict so as to necessitate the grant of a new trial. However, I conclude that the facts of this case are substantially different, and that the trial court's ruling deprived Appellant of a fair trial.

¶ 2 In the instant case, exculpatory evidence in the form of a letter written by Ricardo Jones to the police inculpating two individuals other than Appellant was not disclosed pre-trial, but was disclosed during trial. In particular, the trial court overruled defense counsel's objection to the admission of this evidence, which objection was lodged on the bases that the letter was first disclosed to the defense *after* Jones had already testified on direct examination and that the admission of the letter would effectively torpedo Appellant's theory of defense by impeaching Jones' testimony that Appellant was not present when the victim was assaulted. Consequently, faced with such a violation of Appellant's right to due process, I am compelled to respectfully dissent.

¶ 3 "In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held 'that suppression by the prosecutor of evidence favorable to an accused upon request vio-

lates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Commonwealth v. Moose,* 529 Pa. 218, 602 A.2d 1265, 1272 (1992). Pursuant to Pa.R.Crim.P. 573, the Commonwealth has the following duty to disclose evidence to a defendant:

**Rule 573. Pretrial Discovery and Inspection.**

. . .

**(B) Disclosure by the Commonwealth**

(1) *Mandatory:*

In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case.

> (a) Any evidence favorable to the accused that is material either to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth;

Pa.R.Crim.P. 573(B). "The purpose of the discovery rules is to permit the parties in a criminal matter to be prepared for trial. Trial by ambush is contrary to the spirit and letter of those rules and cannot be condoned." *Moose,* 602 A.2d at 1274.

¶ 4 Under Rule 573, the Commonwealth has a duty to disclose all material evidence favorable to the defendant. Pa.R.Crim.P. 573. This includes any such evidence of which the Commonwealth becomes aware and has reason to believe would assist the accused in establishing his innocence or reducing punishment. *See Commonwealth v. Montgomery,* 533 Pa. 491, 626 A.2d 109 (1993). This affirmative duty is ongoing throughout the trial process and favors immediate disclosure by the Commonwealth upon its receipt of such evidence. *Id.* Furthermore, when assessing the ma-

teriality of evidence to the defendant's case, both the defendant's ability to adequately prepare and present a defense must be considered. Any adverse effect such nondisclosure would cause to a defendant's trial strategy must be weighed in determining whether the evidence should be deemed material. *See United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

¶ 5 In the instant case, the evidence in question, Jones' written statement to the police, is material for a number of reasons. First, it creates a reasonable doubt which did not otherwise exist, as it offers a scenario of the assault which implicates two men other than Appellant. This is clearly exculpatory since it is evidence that Appellant did not commit the crime of which he was accused. Secondly, there is little doubt that Appellant would have altered his trial strategy had he been privy to Jones' letter prior to trial. Had Appellant known about this letter, he could have used it in his defense to raise a reasonable doubt as to who was actually responsible for the assault of Cambra. In the alternative, Appellant could have used this information to confront Jones about his prior inconsistent statement before calling him to the stand. Further, it is quite likely that given Jones' questionable credibility Appellant would have chosen not to call him as a witness at all. By waiting until after Jones took the stand to reveal the letter as impeachment evidence, the Commonwealth engaged in an unacceptable ambush of Appellant's sole witness given its ongoing duty under Rule 573 to disclose all favorable evidence to Appellant.

¶ 6 In *Commonwealth v. Ulen,* 539 Pa. 51, 650 A.2d 416 (1994), our Supreme Court addressed the issue of what would constitute the proper remedy for the Commonwealth's failure to disclose in a substantially similar factual scenario. In

*Ulen,* the defendant and an individual named Aleta Bell were arrested on drug charges in a public restroom. The only physical evidence against the defendant was a syringe containing cocaine and a packet containing cocaine closeby. There were no fingerprints on either.

¶ 7 At trial, the defendant called James Henry to testify on his behalf. Henry testified that he had seen Bell earlier that night with a syringe and a balloon. This testimony was offered in an effort to prove that the cocaine and syringe found next to the defendant and Bell did not belong to the defendant, but rather to Bell. Henry also testified that he had not discussed the case with anyone other than his mother, the defendant's counsel, and Bell.

¶ 8 In rebuttal, the Commonwealth called Charleene Bullock who had known Bell from prison. Bullock testified that Henry had contacted her and arranged a meeting between herself, Henry and the defendant. At this meeting, the defendant agreed to "take care of" Bullock if she testified that during her time with Bell in prison, Bell confessed that she was the one who possessed the drugs. Of course, this rebuttal testimony impeached Henry's testimony that he had not discussed the case with anyone other than his mother, the defendant's counsel, and Bell. The Commonwealth also offered to play a tape recording of the conversation between Bullock and Henry, and defense counsel objected. The tape was not given to defense counsel before trial, and defense counsel objected that this was a violation of the Commonwealth's discovery obligation. The trial court overruled the objection.

¶ 9 In concluding that the Commonwealth violated Rule 573 (then numbered Rule 305), and that the defendant was entitled to a new a trial, the Court stated:

The purpose of RULE 305 is to prevent trial by ambush which, of course, leads to a denial of due process. Protestations by the Commonwealth (brief, p. 18) that the defense was given adequate remedy by being provided during trial with a transcript and discovery of the tapes ring hollow in light of the fact that Henry had already testified. That, of course, is the chief problem: whether defense counsel would have even called Henry had he known of the existence of these tapes or simply have relied for its chances on prosecution testimony alone.

*Ulen,* 650 A.2d at 419.

¶ 10 I conclude that we are faced with a similar "chief problem" in this case. Thus, the fact that the letter was not disclosed until after Jones testified, and that the trial court then allowed the Commonwealth to use the letter to impeach Jones is to me a pivotal point in the disposition of this case. The Majority, on the other hand, never engages this issue. Rather, the Majority anchors its analysis with such conclusions as: "The proffered impeachment evidence on which the defendant relies is not sufficiently favorable, *and its suppression was not sufficiently prejudicial, to satisfy the constitutional threshold of materiality;* " and "Although we do not condone the apparent lack of diligence that *prompted the Commonwealth's non-disclosure, we do not find it a sufficient reason on which to grant a new trial.*" Majority Opinion at 407–08, 409 (emphasis added). Again, were this a case of simple non-disclosure then I would agree with the Majority. Instead this is a case of a criminal defendant being deprived of a fair trial due to the trial court permitting the Commonwealth to introduce evidence that should have been precluded due to a violation of Rule 573. I cannot sanction such a

ruling, and accordingly, I record my dissent.