## Commonwealth v. White

*James T. Goldsmith, assistant district attorney,* trial counsel for Commonwealth.

*Alisa R. Hobart, assistant district attorney,* P.C.R.A. counsel for Commonwealth.

*Richard P. Reynolds,* trial counsel for appellant.[1]

*Allen Daringer,* P.C.R.A. counsel for appellant.

1. Attorney Reynolds was appointed as trial counsel by Judge Jeffrey K. Sprecher, to whom this case was originally assigned, on February 24, 2005. This case was reassigned from Judge Sprecher to this court prior to the trial.

STALLONE, *J.*, August 20, 2009—On June 27, 2007, a jury found the appellant, Tommy White, guilty of first-degree murder,[2] aggravated assault manifesting extreme indifference to the value of human life[3] and possessing instruments of crime,[4] arising out of the death of Brian Scott Crow on February 9, 2006, at 1111 Green Street in the City of Reading.[5] On July 17, 2007, this court sentenced the appellant to the mandatory sentence of life in prison without parole on the first-degree murder conviction[6] with credit for 887 days time served, along with a fine in the amount of $5,000 and restitution in the amount of $6,763.[7]

Thereafter, the appellant, by and through trial counsel, filed a timely appeal to the Superior Court of Pennsylvania. Upon being advised of the filing of the appeal, this court entered an order on August 20, 2007, for the appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) within 21 days from that date. However, the concise statement was never filed and the appeal was eventually dismissed by per curiam order of the Superior Court entered on October 10, 2007, due to trial counsel's failure to file the docketing statement required by Pa.R.A.P. 3517.

---

2. Title 18, 18 Pa.C.S. §2502(c) (Supp. 2009).

3. Title 18, 18 Pa.C.S. §2702(a)(1) (Supp. 2009).

4. Title 18, 18 Pa.C.S. §907(a) (Supp. 2009).

5. As a result of finding the appellant guilty of first-degree murder, the jury did not return verdicts on the remaining homicide charges of third-degree murder and voluntary manslaughter.

6. Title 18, 18 Pa.C.S. §1102(a)(1) (Supp. 2009).

7. We imposed a sentence of six months to five years for possessing instruments of crime, to run concurrently with the life sentence imposed for first-degree murder, but did not impose any sentence on the aggravated assault conviction, as it merged for sentencing purposes with the first-degree murder conviction.

Moreover, the appellant did not file a petition for allowance of appeal, but instead filed a timely first petition for relief under the Post Conviction Relief Act on June 18, 2008. Upon being advised of that filing, this court appointed Allen Daringer, Esquire, to represent the appellant. With his assistance, the appellant then filed an amended first petition for relief under the Post Conviction Relief Act, seeking (1) the restoration of his appellate rights nunc pro tunc, and/or (2) a new trial. A hearing on this amended first petition was originally scheduled to be held before this court on December 12, 2008, but was continued to February 18, 2009, and thereafter to March 18 and 20, 2009, at the appellant's request.[8]

---

8. Immediately prior to the scheduled start of the hearing on December 12, 2008, Attorney Daringer advised this court that he was unsure whether the appellant was competent to assist him at the hearing. Having been apprised of that information, this court continued the hearing until February 18, 2009, in order to give both Attorney Daringer and the assistant district attorney, Alisa R. Hobart, the opportunity to make this determination and research the relevancy of the competency issue, if in fact there was one.

On February 17, 2009, this court held a "status conference" with counsel, at which the appellant was not present, by agreement, and which was not stenographically recorded, for the sole purpose of receiving an update from counsel on the results of their research. Upon being advised by both counsel that there was little case law on the issue, this court directed Attorney Daringer to have the appellant evaluated by Larry Rotenberg M.D., who had previously evaluated the appellant prior to trial. It was understood and agreed by both counsel that the sole purpose of Dr. Rotenberg's evaluation would be to determine the appellant's competency for purposes of this post-conviction proceeding, as opposed to his competency either prior to trial, at trial or at sentencing.

This competency hearing was scheduled to begin before this court on March 18, 2009. On that date, this court was advised that the appellant had refused to cooperate with Dr. Rotenberg in having the evaluation performed when Dr. Rotenberg went to see him at Berks

At the hearing held on March 20, 2009, the appellant asked this court to grant relief, as to his amended first petition, in the form of an order reinstating his appeal rights nunc pro tunc, in lieu of proceeding with argument in support of his post-conviction claims.[9] This court entered an "ineffectiveness" order on March 25, 2009 by agreement of counsel,[10] giving the appellant leave to

County Prison on March 9, 2009. N.T., competency hearing, March 18, 2009, pp. 21-23. However, after an extended colloquy, the appellant promised this court that he would cooperate with Dr. Rotenberg. N.T., competency hearing, March 18, 2009, pp. 32-37. As a result, Dr. Rotenberg was able to evaluate the appellant on March 19, 2009 and to complete his written report by March 20, 2009.

The competency hearing was therefore held on March 20, 2009, at which time this court heard testimony from Dr. Rotenberg and engaged in a further colloquy with the appellant. At the conclusion of the hearing, this court made a finding that the appellant was competent to assist Attorney Daringer in this post-conviction proceeding. In doing so, this court took into consideration Dr. Rotenberg's testimony that the appellant understood the nature of the proceeding, based not only upon his evaluation of the appellant on March 19, 2009, but also his observations of the appellant in the courtroom on March 18, 2009, the appellant's communications with Attorney Daringer, his responses to this court's several questions and his promise to the court that he would in fact cooperate with the evaluation. N.T., competency hearing, March 20, 2009, pp. 10-11. Our finding was also based in part upon the appellant's own admission that he was able to assist Attorney Daringer in this post-conviction proceeding. N.T., competency hearing, March 20, 2009, pp. 26-27.

9. This request was made with the understanding that the appellant would have to file another post-conviction petition in order for this court to entertain the merits of his post-conviction claims, in the event that the within appeal would be denied. N.T., competency hearing, March 20, 2009, pp. 30-31.

10. The text of our order is as follows:

"And now, March 25, 2009, after a hearing held on the defendant's amended first petition for relief under the Post Conviction Relief Act, in which he is claiming, inter alia, that his trial counsel, Richard P. Reynolds, Esquire, was ineffective in failing to perfect his direct appeal

file a direct appeal nunc pro tunc no later than 30 days from that date. The appellant has timely filed that appeal, in which he is now raising a total of five issues for appellate review.[11]

His first contention is that the evidence at trial was insufficient to support his convictions for first-degree murder, aggravated assault manifesting extreme indifference to the value of human life and possessing instruments of crime, on the basis that the Commonwealth failed to prove "premeditation" and his specific intent to kill Brian Scott Crow, beyond a reasonable doubt. Appellant also makes a related argument that the jury's verdicts are not supported by sufficient evidence, in that the evidence showed that he acted in self-defense while under the influence of drugs and/or alcohol.

---

from the judgment of sentence entered by this court on July 17, 2007, after the appeal had been timely filed, and the Commonwealth having conceded at the hearing that the defendant is entitled to relief as to this particular issue, the same is hereby granted.

"Accordingly, the defendant is given leave to file a nunc pro tunc appeal from the judgment of sentence no later than 30 days from the date of this order."

11. We note at this juncture that the appellant originally raised a total of eight issues, but has since withdrawn three of those eight, without prejudice to raise them in a future post-conviction ineffectiveness proceeding (see footnotes 1, 2 and 3 of the appellant's supplemental concise statement of errors complained of on appeal filed June 25, 2009), as follows:

• The evidence shows that the defendant suffered from a mental infirmity at the time of the alleged crimes;

• The Commonwealth failed to establish a proper chain of custody for the admission of evidence given by a Commonwealth witness (Ronnie Welker) to police; and

• The trial court should have disqualified the jury panel after a juror made comments about the gruesomeness of the crime to his neighbor, one of the lead investigators (Detective Robert Heiden).

In reviewing any claim involving sufficiency of the evidence, this court must determine whether, viewing all of the evidence in the light most favorable to the Commonwealth as the verdict winner, a jury could find that the evidence was sufficient to support a finding of guilt beyond a reasonable doubt on each of the offenses charged. *Commonwealth v. Rios,* 546 Pa. 271, 684 A.2d 1025 (1996). It is the trier of fact which has the responsibility of assessing the credibility of the witnesses and weighing the evidence presented and, in doing so, the trier of fact is free to believe all, part or none of the evidence presented. *Commonwealth v. Mitchell,* 588 Pa. 19, 902 A.2d 430 (2006).

The charge of first-degree murder is defined as an "intentional killing" by section 2502(a) of our Pennsylvania Crimes Code. In order to sustain a verdict for first-degree murder, the Commonwealth must prove beyond a reasonable doubt (1) that a human being was unlawfully killed, (2) that the defendant committed the killing, and (3) that the defendant's conduct was with the specific intent to kill. *Commonwealth v. Fiebiger,* 570 Pa. 583, 810 A.2d 1233 (2002); *Commonwealth v. Ragan,* 560 Pa. 106, 743 A.2d 390 (1999). The specific intent to kill may be inferred when the evidence establishes the use of a deadly weapon on a vital part of the victim's body. *Commonwealth v. Chandler,* 554 Pa. 401, 721 A.2d 1040 (1998).

In order to sustain a conviction for aggravated assault manifesting extreme indifference to the value of human life, the Commonwealth must prove, in addition to the victim sustaining serious bodily injury, that the defendant

acted with the requisite criminal state of mind, under circumstances manifesting an extreme indifference to the value of human life. *Commonwealth v. Roche*, 783 A.2d 766 (Pa. Super. 2001). In a situation where the Commonwealth is claiming specific intent to cause bodily injury, such intent can be inferred from the use of a deadly weapon on a vital part of the victim's body. *Commonwealth v. Nichols*, 692 A.2d 181 (Pa. Super. 1997).

A conviction for possessing instruments of crime should be sustained when the Commonwealth proves beyond a reasonable doubt that the defendant possessed an instrument which is commonly used for criminal purposes, under circumstances which were not manifestly appropriate for its lawful use, with the intent to employ it criminally. *Commonwealth v. Foster*, 438 Pa. Super. 40, 651 A.2d 163 (1994).

The evidence of record in support of these charges is that, on February 9, 2005, Brian Skipper, a volunteer with "Meals on Wheels", arrived at the residence of Brian Scott Crow at 1111 Green Street in the City of Reading, for the purpose of delivering a meal to Mr. Crow. N.T., trial, p. 38. Mr. Skipper knocked on the door, but did not receive any response. N.T., trial, pp. 38-39. He then opened the door, as he was permitted to do by his employer, and entered the residence. N.T., trial, p. 39. Mr. Skipper began calling out the victim's name, but again received no response. N.T., trial, p. 40. After walking through the living room and entering the bedroom, he observed Mr. Crow lying on a bed, with his legs draped over the bed, and not wearing any clothing. N.T., trial,

p. 41. Mr. Skipper and a co-worker who was with him immediately went next door to a neighbor's residence and called 9-1-1. N.T., trial, pp.42-43. Mr. Skipper remained at the scene until Officers Robert Fontanez and Bobby Moser of the Reading Bureau of Police arrived on scene. N.T., trial, p. 43. Upon their arrival, Officers Fontanez and Moser entered the residence, observed the victim lying on the bed and promptly secured the crime scene. N.T., trial, pp. 51, 55, 56.

After Mr. Crow was pronounced dead, his body was removed from the residence and taken to the morgue at the Reading Hospital and Medical Center where it remained until February 10, 2005, when it was taken to the Lehigh Valley Medical Center for the performance of an autopsy by Samuel Land M.D., a forensic pathologist. N.T., trial, p. 283. During the course of the autopsy, Dr. Land determined that a total of 18 sharp-force wounds had been inflicted on Mr. Crow, some of which were "stab" wounds and some of which were "slash" wounds. N.T., trial, pp. 283-84. Dr. Land's examination revealed a total of seven stab wounds to the left chest, in the area of the left nipple. N.T., trial, p. 286.[12] Dr. Land further observed that each of these stab wounds penetrated the chest cavity and the heart, the aorta and the inferior vena cava. N.T., trial, p. 286. Each of these wounds were "fatal" and would have caused rapid death. N.T., trial, p. 286-87. Dr. Land's examination also revealed a "slash"

---

12. These wounds are reflected on a black and white photograph which was marked and admitted into evidence at trial as Commonwealth exhibit C-23.

wound to the neck,[13] along with three wounds to the upper right side of the neck, three wounds to the lower right side of the neck, and three wounds to the upper chest. N.T., trial, p. 288.[14] Of the total of 18 sharp-force wounds, 17 of them were consistent with the use of a scissors, with the remaining wound being consistent with the use of a knife. N.T., trial, p. 295. The autopsy further revealed "blunt force trauma" to various parts of Mr. Crow's body, including his eyes, left cheek and both ears. N.T., trial, p. 294.

In addition to the 18 sharp-force wounds and "blunt force trauma", Dr. Land also discovered that Mr. Crow's penis had been severed from his body, which was in and of itself a potentially fatal wound due to excessive bleeding. N.T., trial, pp. 292-93.[15] Due to the presence of jagged tissue, the severing of Mr. Crow's penis was not a clean amputation, but instead appeared, in Dr. Land's opinion, to have required some effort in the form of "sawing" motions. N.T., trial, p. 293.

The evidence of record further reveals that, on the morning of February 9, 2005, between 2 a.m. and 2:30 a.m., the appellant arrived at the apartment of his stepfather, Ronnie Welker, located at 233 North Sixth Street in the City of Reading. N.T., trial, p. 134. When Mr.

13. This wound is reflected on a black and white photograph which was marked and admitted into evidence at trial as Commonwealth exhibit C-20.

14. These wounds are reflected on a black and white photograph which was marked and admitted into evidence at trial as Commonwealth exhibit C-26.

15. This wound is reflected on a black and white photograph which was marked and admitted into evidence at trial as Commonwealth exhibit C-22.

Welker opened the door, he observed the appellant to be in "disarray", with blood on his clothing and on his hands. N.T., trial, pp. 134, 135, 137. Mr. Welker did not observe any injuries to the appellant, except perhaps for a swollen hand. N.T., trial, p. 135. The appellant was holding a pair of scissors[16] and said, "I think I fucked up—I think I hurt somebody this time." N.T., trial, p. 135. The appellant then proceeded to take off his clothes and put them, along with his boots, the scissors and the knife,[17] into a plastic trash bag which he asked his stepfather to "get rid of." N.T., trial, p. 136. Appellant stayed at his stepfather's apartment that night, but left the following morning to go to work. N.T., trial, p. 139.

The following day, the appellant called his stepfather from a local hotel and told him that he was thinking of going either to Ohio or Texas, where his sisters lived. N.T., trial, pp. 140-41. When it appeared that the appellant might in fact leave Pennsylvania, Mr. Welker contacted the Reading Bureau of Police and took the trash bag to City Hall. N.T., trial, pp. 143-44. Mr. Welker did not put anything into or take anything out of the trash bag or even touch its contents, prior to turning it over to the police. N.T., trial, p. 144.

The appellant returned to his stepfather's apartment later that same day, at which time Mr. Welker, without the appellant's knowledge, telephoned the police. N.T., trial, pp. 145-46. A short time later, Mr. Welker, by pre-arrangement with the police, exited the apartment with

16. The pair of scissors was marked and admitted into evidence as Commonwealth exhibit C-15.

17. The knife was marked and admitted into evidence as Commonwealth exhibit C-16.

the appellant. N.T., trial, pp. 146, 158, 159. They got into Mr. Welker's vehicle, whereupon they were immediately stopped by the police. N.T., trial, pp. 146, 158-59. The appellant was placed under arrest and taken to City Hall, where he was advised of his constitutional rights. N.T., trial, p. 256.

After waiving his rights, the appellant gave a 23-page written statement to Criminal Investigators Robert Heiden and Barry Rambo of the Reading Bureau of Police, in which he admitted stabbing Brian Scott Crow with a pair of scissors in the chest area and cutting off Mr. Crow's penis with a knife. N.T., trial, pp. 256-61.[18] While the statement was being taken, Criminal Investigator Heiden was asking the questions, while Criminal Investigator Rambo was taking notes of the appellant's answers. N.T., trial, pp. 251, 254. Afterward, the appellant was given the opportunity to review each of the questions and answers and proceeded to initial and sign each answer and each page. N.T., trial, p. 261.

In accordance with Pennsylvania law, this court instructed the jury that it could find specific intent if it found that the appellant had knowingly applied deadly force to a vital part of Brian Scott Crow's body. N.T., trial, p. 359. As a result, there is sufficient evidence in the record, consisting not only of Dr. Land's testimony,

18. The appellant's written statement was marked as Commonwealth exhibit C-12, but was not admitted into evidence because of Pa.R.Crim.P. 646(B)(2), which provides that:

"(B) During deliberations, the jury should not be permitted to have

. . .

"(2) A copy of any written or otherwise recorded confession by the defendant."

but also the appellant's own written statement to the police, to support a finding that he used the scissors to stab Brian Scott Crow seven times in the left chest area, in the area of the heart and aorta, which certainly was a vital part of Mr. Crow's body. In our view, therefore, the evidence is sufficient to establish beyond a reasonable doubt, not only that the appellant killed Brian Scott Crow, but that he did so with the requisite specific intent. For that reason, we must reject this part of the appellant's sufficiency claim as being without any merit, which then leaves us with the remaining portion of his claim as it relates to voluntary intoxication and self-defense.

We refused to give any instruction to the jury on voluntary intoxication on the basis that the evidence did not support it, as trial counsel readily acknowledged at trial. (N.T., trial, pp. 329-30):

"The Court: I would think defense counsel would run into more of a problem with that, *especially when the evidence with regard to 'intoxication' is, as I said yesterday, is very, very weak,*[19] but I will let Mr. Reynolds at least make the first call with regard to that, and then I will make a ruling.

"Mr. Reynolds: What is the first call, your honor?

"The Court: The first call is do you really want a voluntary intoxication charge to the jury?

"Mr. Reynolds: Do I want one?

"The Court: Yes.

---

19. All italicized language in this memorandum opinion is for emphasis only.

"Mr. Reynolds: *Frankly, in all candor to the court, it appears to me I am not entitled to it on the status of the evidence.*

"The Court: I don't think you are entitled to it, and I think it is going to weaken your argument if you're pushing for this self-defense. And in either event, I will not give the instruction with regard to intoxication based upon the record as it stands today at this moment."

And as for his claim that the evidence showed that he killed Brian Scott Crow in self-defense, we disagree; on the contrary, while we did instruct the jury on the law of self-defense,[20] the physical evidence, including but not

---

20. The text of our instruction was as follows (N.T., trial, pp. 366-68):

"Now, the evidence in this case has also raised the issue of whether the defendant acted in self-defense when he stabbed Brian Scott Crow. Self-defense is another form of justification in the law of Pennsylvania. And if the defendant's actions were justified because of self-defense, you cannot find him guilty beyond a reasonable doubt. Moreover, you should know that it is the Commonwealth's burden to prove beyond a reasonable doubt that the defendant did not act in justifiable self-defense.

"If the Commonwealth proves to you beyond a reasonable doubt that the defendant used force, then to prove that such force was not justifiable in this case, it must prove beyond a reasonable doubt that the defendant did not reasonably believe that he was in immediate danger of death or serious bodily injury from Brian Scott Crow at the time that he used the force and that therefore his belief that it was necessary for him to use deadly force to protect himself was unreasonable.

"To put it another way, the Commonwealth must prove either that the defendant did not actually believe that he was in danger of death or serious bodily harm such that he needed to use deadly force to defend himself at that moment, or, that while the defendant actually believed that he needed to use such force, his belief was unreasonable in light of all the circumstances known to him at that time.

limited to the size of the appellant relative to that of the victim, the number of wounds inflicted upon the victim, the location of the wounds on vital parts of the victim's body and the precision with which they were inflicted, indicating that the victim was "pinned down" at the time, was sufficient to support the jury's finding that the appellant did not act in self-defense.[21]

Next, the appellant claims that the jury's verdicts were likewise against the weight of the evidence, on the basis that the jury convicted him based solely upon the gruesomeness of the evidence presented.

---

"Keep in mind also that a person is justified in using deadly force against another not only when they are in actual danger of an unlawful attack, but also when they mistakenly, but reasonably, believe that they are. A person is entitled to estimate the necessity for the force that he or she employs under the circumstances that he or she reasonably believes them to be at the time.

"In the heat of conflict, a person who has been attacked ordinarily has neither the time nor the composure to evaluate carefully the danger and make these judgments about exactly how much force is needed to protect himself or herself. You should consider the realities of the situation faced by the defendant here when you assess whether the Commonwealth has proven beyond a reasonable doubt either that he did not believe that he was actually in danger of death or serious bodily injury to the extent that he needed to use such force in self-defense or that while he did believe, that his belief was unreasonable.

"If the Commonwealth proves this element beyond a reasonable doubt, the actions of the defendant in using deadly force are not justified. If the Commonwealth fails to prove this element, the defendant's action was justified and you must find him not guilty of any of the charges of first-degree murder, third-degree murder, voluntary manslaughter and aggravated assault or even possession of an instrument of crime."

21. See N.T., trial, pp. 300-307.

As a threshold issue, we note that a "weight of the evidence" claim must be initially raised before the trial court. Pa.R.Crim.P. 607(A). Here, the appellant did not do so, which means that he has waived his right to seek review of this particular claim in this appeal. *Commonwealth v. Ferguson,* 866 A.2d 403 (Pa. Super. 2004).

However, even assuming arguendo that he had properly preserved this claim by first raising it before this court, we would still disagree on its merits. In Pennsylvania, a "weight of the evidence" claim concedes that sufficient evidence exists to support a verdict, but questions the believability of that evidence. *Commonwealth v. Lewis,* 911 A.2d 558 (Pa. Super. 2006). When reviewing this type of claim, the reviewing court does not sit as a "13th juror" for the purpose of assessing the credibility of the witnesses or to determine whether it would have reached the same verdict. *Commonwealth v. Widmer,* 560 Pa. 308, 744 A.2d 745 (2000). Rather, the reviewing court must only determine whether the evidence is so tenuous, vague and/or uncertain that the jury's verdicts "shock the conscience" of the court and should be set aside. *Commonwealth v. Sullivan,* 820 A.2d 795, 806 (Pa. Super. 2003).

Moreover, based upon our review of the record, the appellant has not pointed us to anything to substantiate this claim, nor do we see anything which would indicate that the jury reached its verdicts based solely upon the alleged gruesomeness of the evidence presented. As a result, there being nothing which shocks this court's conscience as to any of the jury's verdicts, we see no need to disturb them.

Appellant's next contention is that he was subjected to an illegal arrest, made without probable cause and without an arrest warrant, and that the written statement which he subsequently gave to the police was not knowingly, intelligently and voluntarily given.[22] This claim is based upon his assertion that he was taken into custody on the "pretext" of an outstanding arrest warrant on a burglary charge, when in fact he was being arrested on the charges filed in the instant case. However, the record shows that the appellant did not file a pretrial motion challenging the legality of his arrest or the admissibility of his written statement, which means that this claim must also be considered as waived for purposes of this appeal. See *Commonwealth v. Groff,* 378 Pa. Super. 353, 548 A.2d 1237 (1988).

Next, the appellant contends that this court erred in denying him the right to cross-examine his stepfather, Ronnie Welker, with regard to Mr. Welker's prior convictions. Although the appellant does not specify the convictions that he is referring to, the record indicates that Mr. Welker had prior convictions for forgery in 1973, retail theft in 1974, burglary in 1981 and forgery in 1982. N.T., trial, p. 148. Hence, a period of more than 10 years has clearly elapsed since the date of these convictions or from Mr. Welker's release from any sentence of confinement imposed for those convictions. The text of Pa.R.E. 609(A) is as follows:

"For the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of

22. He showed no signs of intoxication and did not exhibit any confusion in responding to Criminal Investigator Heiden's questions while the statement was being taken. N.T., trial, p. 251.

a crime, whether by verdict or by plea of guilty or nolo contendere, shall be admitted if it admitted dishonesty or false statement. Evidence of a conviction under this rule is not admissible if a period of more than 10 years has elapsed since the date of the conviction or the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interest of justice, that the probative value of the conviction substantially outweighs its prejudicial effect. However, evidence of a conviction more than 10 years old as calculated herein is not admissible unless the proponent gives the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence."

In making its ruling, this court not only took into account the age of the convictions, but also the fact that no evidence was presented to this court concerning the facts and circumstances underlying those convictions.[23] Without such information, this court was not in a position to conclude that the probative value of the convictions substantially outweighed any prejudicial effect resulting from their admission. The record is likewise devoid of any evidence that the appellant provided sufficient advance written notice to the Commonwealth of his intent to elicit such testimony from Mr. Welker. And so, for these reasons, we did not err in preventing the appellant from cross-examining Mr. Welker concerning his prior convictions.

---

23. See N.T., trial, pp. 147-52.

Appellant's fourth contention is that this court erred in not declaring a mistrial after one of the principal jurors displayed "sickness" due to the graphic nature of some of the evidence presented at trial. In making this claim, the appellant is referring to juror no. 2, Richard Clausen, who was excused and replaced by alternate juror no. 2, Jeffrey Erb. The record discloses the following events which led to this court's decision to do so (N.T., trial, pp. 297-99):

"Juror No. 2: Your honor, may I be excused?

"The Court: All right. We will have a recess for 10 minutes. He may be excused.

"(The juror left the courtroom at 1:50 p.m.)

"The Court: What was that juror's number?

"The Tipstaff: Juror no. 2.

"The Court: Okay. Let's take 10 minutes . . .

"The Court: Mr. Reynolds, do you want to make any comment at this point?

"Mr. Reynolds: Yeah, I would make a motion to remove juror no. 2.

"Mr. Goldsmith: Whatever the court deems appropriate. I don't have an opinion on that.

"The Court: Well, I see no reason for the court to remove juror no. 2. If the Commonwealth agrees to it in view of the fact that we have three alternate jurors here, then I will, but I don't want to create a problem.

"Mr. Goldsmith: I have no objection to it.

"The Court: You have no objection to it. All right. I am just going to talk to Mr.—to him and tell him that he

is excused. His name is Richard Clausen, and substituting then for Mr. Clausen will be the second alternate juror that we had here, Jeffrey Erb. Okay, Mr. Reynolds, any objection to me talking to Mr. Clausen privately out in the hallway?

"(The jury entered the courtroom.)

"The Court: All right. For the members of the jury and for the record, Mr. Clausen has been excused from serving on this jury by agreement of all parties concerned. And I just felt that that would be better than take a chance that he might have some further repercussions and then we'd all feel a little bad about it, especially since we have the privilege of having three alternate jurors.

"So, in either event, Mr. Erb now is substituting for Mr. Clausen and will remain on the main panel as juror no. 2. Okay. Thank you very much."

As noted, the record shows that, although trial counsel asked that juror no. 2 be "removed", he did not request a mistrial, thereby resulting in a waiver of this claim for purposes of this appeal. See *Commonwealth v. Bell,* 386 Pa. Super. 164, 562 A.2d 849 (1989). However, even assuming arguendo that the request had been made, it is well settled that a motion for a mistrial is addressed to the sound discretion of the trial court. *Commonwealth v. Lettau,* 955 A.2d 360 (Pa. Super. 2008). Under Pennsylvania law, the "extreme" remedy of a mistrial is appropriate only when the incident complained of is such that its unavoidable effect is to deprive a defendant of a fair and impartial trial. *Commonwealth v. Powell,* 598 Pa. 224, 956 A.2d 406 (2008); *Commonwealth v. West,* 937 A.2d 516 (Pa. Super. 2007).

Here, this court properly exercised its discretion in removing Mr. Clausen and substituting Mr. Erb. The appellant has not pointed us to any evidence of record or legal authority for his position that our decision deprived him of a fair and impartial trial in this case. Therefore, we likewise reject this claim as being without any merit whatsoever.

Finally, the appellant contends that the assistant district attorney, James T. Goldsmith, Esquire, engaged in prosecutorial misconduct in making the following three statements during his closing argument (N.T., trial, pp. 386-87):

(1) "Maybe as defense counsel elicited in its cross-examination of Dr. Land yesterday that the bruises inside Brian's mouth were caused by forced oral sex, that the defendant went over there to rape an easy frail target and then kill the only victim of his sex crime, the only witness to his sex crime. It might have happened that way." (N.T., trial, p. 386);

(2) "Might have happened that the defendant who we know used drugs, drugs were in his system, we know he was a user. There is evidence of that. There is no evidence that he was a drug dealer as Mr. Reynolds eludes. It may have been those fake cocaine bags were brought over by the defendant, Tommy White, in exchange for sex, and when the victim realized he got burn bags, he got raped and then killed." (N.T., trial, p. 386); and

(3) "There were two people in that room that night. One of them giving a statement to the police that he gave after being able to think of what his story would be two-and-a-half days later. The other one you never heard

from. So you have to look at the surrounding evidence to come to the conclusion of what Brian Crow's testimony would be if he were here today." (N.T., trial, p. 387).

Initially, we note that trial counsel did not object to any of these comments, resulting in the waiver of this claim for purposes of this appeal. *Commonwealth v. Goins,* 508 Pa. 270, 495 A.2d 527 (1985); *Commonwealth v. Galloway,* 771 A.2d 65 (Pa. Super. 2001); *Commonwealth v. Green,* 251 Pa. Super. 318, 380 A.2d 798 (1977).

However, even assuming arguendo that one or more timely objections had been made, we note that, as a general rule, a prosecutor is permitted to vigorously argue his case to a jury in summation as long as his comments are supported by the evidence and/or based on inferences which can reasonably be derived from that evidence. *Commonwealth v. Hardcastle,* 519 Pa. 236, 254, 546 A.2d 1101, 1109 (1988).[24] In the present case, the assistant district attorney's comments were certainly within the fair scope of the evidence, as they were based upon testimony by the witnesses and/or reasonable inferences to be drawn from that testimony. Therefore, we likewise reject this claim as being without any merit.

And so, for these reasons, we affirm the judgment of sentence and respectfully request that the instant appeal be denied.

---

24. Furthermore, in accordance with Pennsylvania law, this court instructed the jury that the closing arguments of counsel are not evidence in the case (N.T., trial, pp. 373-74) and a jury is presumed to have followed a trial court's instructions. *Commonwealth v. Baker,* 531 Pa. 541, 614 A.2d 663 (1992); *Commonwealth v. Green,* 525 Pa. 424, 581 A.2d 544 (1990).