J-S25008-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| DANIEL STEVEN DIEFFENBACH | : | |
| | : | |
| Appellant | : | No. 685 MDA 2019 |

Appeal from the Judgment of Sentence Entered December 4, 2018
In the Court of Common Pleas of Luzerne County Criminal Division at
No(s):  CP-40-CR-0000862-2018

BEFORE:  LAZARUS, J., DUBOW, J., and KING, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED JULY 29, 2020**

Daniel Steven Dieffenbach appeals from the judgment of sentence, entered in the Court of Common Pleas of Luzerne County, after a jury convicted him of burglary,[1] simple assault,[2] recklessly endangering another person (REAP),[3] and resisting arrest.[4]  Upon careful review, we affirm.

On the morning of September 6, 2017, the victim, C.K., woke up and readied her two children for school.  She departed the house with her children at 7:11 a.m., to drop them off at the bus stop.  C.K. did not lock the door to her home as she left.  Nevertheless, she did have a security application on her

---

[1] 18 Pa.C.S.A. § 3502(a)(1)(ii).

[2] 18 Pa.C.S.A. § 2701(a)(1).

[3] 18 Pa.C.S.A. § 2705.

[4] 18 Pa.C.S.A. § 5104.

phone that monitored and logged when the doors to her home opened and closed. While C.K. was away, and without her knowledge, Dieffenbach, C.K.'s ex-husband, entered the home at 7:12 a.m., which was logged by the security application on C.K.'s phone. After getting the kids on the bus, C.K. returned to her home at 7:19 a.m., locked the door behind her, and walked up to the second floor master bathroom located within her bedroom.

As she got ready for work, C.K. looked into the bathroom mirror and saw Dieffenbach appear in the reflection. C.K. had a valid protection from abuse order (PFA)[5] against Dieffenbach, which was in effect on that day.[6] *See* N.T. Trial, 10/16/18, at 28, 111, 149, 166-67. In response to seeing Dieffenbach's reflection, C.K. screamed. Dieffenbach then moved toward her, put his hand over her mouth and nose, shut the bathroom door, and put C.K. up against the bathroom wall. *Id.* at 40. C.K. could not breathe because Dieffenbach was covering her nose and mouth. *Id.* at 40-41. When C.K.

---

[5] *See* 23 Pa.C.S.A. §§ 6202-6122 (Protection from Abuse Act (PFAA)).

[6] At trial, Dieffenbach and the Commonwealth stipulated to the following facts:

> [C.K.] was granted a [PFA] against Daniel Dieffenbach on January 27[,] 2016. The [PFA] prevents [] Dieffenbach from abusing or having any contact with [C.K.]. The [PFA] completely evicts and excludes [] Dieffenbach from the residence located [in] Newberry Estates, Dallas, Pennsylvania, 18612. On December 8[,] 2016, a Luzerne County Judge granted an extension of [C.K.'s] [PFA] against [] Dieffenbach. The [PFA] shall expire on December 8[], 2019. A violation of [PFA] carries criminal penalties.

N.T. Trial, 10/16/18, at 28.

stopped screaming, Dieffenbach removed his hand from her face. C.K. was able to move towards the shower and sit down in the corner of the bathroom. While on the floor, C.K. told Dieffenbach that he was not permitted to be in the house and that he needed to leave. *Id.* at 41.

C.K. then remembered that she left her phone on the bench at the end of her bed, located just outside of the bathroom door. C.K. asked Dieffenbach if she could leave the bathroom "to breathe," because she needed space and she promised him that she would not scream. *Id.* at 42. Dieffenbach opened the bathroom door. C.K. exited and sat on the bench, covered her phone and hid it between her elbow and her side, to keep Dieffenbach from seeing it. Once in possession of her phone, C.K. walked over to the bed and curled up in it, facing away from Dieffenbach. With the phone hidden under the pillow, C.K. dialed 911. *Id.* Although she was not able to have a direct conversation with the 911 operator because she was speaking directly with Dieffenbach at that time, C.K. did yell the address of her home prior to the conclusion of the 911 call, which alerted the police to her location.

Upon yelling her address through the phone, Dieffenbach was also alerted to the phone call. He discovered C.K.'s phone and took it from her. Dieffenbach began pacing back and forth in the bedroom asking why C.K. "did [] this to him." *Id.* at 46. As Dieffenbach was pacing, when he reached the furthest point away from the bedroom exit, C.K. attempted to run to the exit, to get to the stairs. However, Dieffenbach was able to prevent C.K. from leaving by grabbing her and throwing her to the ground. *Id.* As C.K. was

- 3 -

laying on her back, Dieffenbach put his hands around her throat and squeezed hard, which made it difficult for C.K. to breathe, and placed her in fear. *Id.* C.K. managed to kick herself free and crawl away.

At that point, the doorbell rang. In response to the doorbell, C.K. began to scream. Dieffenbach put his hand over C.K.'s mouth again, which prevented her from breathing. *Id.* at 47. Dieffenbach told C.K. to stop screaming, removed his hand, and began pacing in the bedroom again. When C.K. looked up at him, she noticed that Dieffenbach was now holding a hammer, which was usually placed in a basket on C.K.'s dresser. *Id.* at 48. The hammer was in the room because it was previously used to hang pictures on the wall. The fact that Dieffenbach was holding a hammer scared C.K. "to death." *Id.* at 49.

At that point, the doorbell rang for a second time. Dieffenbach then said, "just kill me," as he threw the hammer onto the bed. *Id.* at 49-50. He then asked C.K. if she would let him leave. *Id.* at 50. C.K. agreed, and Dieffenbach proceeded down the stairs. C.K. followed him down the stairs and opened the front door, where Police Officer David Rinehimer, of the Dallas Borough Police Department, was waiting. C.K. informed Officer Rinehimer that Dieffenbach was leaving through the rear of her home. *Id.* at 109.

Police Officer Wade Curtis, of the Township of Kingston, assisted Officer Rinehimer on that day. Officer Curtis heard Officer Rinehimer call out that the suspect was exiting the rear of the house. *Id.* at 100. Officer Curtis went to the rear of the house and saw Dieffenbach running in the backyard. Officer

Curtis drew his service weapon and commanded Dieffenbach to stop and get on the ground, which Dieffenbach did not obey. Instead, Dieffenbach headed into a wooded terrain with rocks and leaves, which had a significant drop-off, before leveling off. *Id.* at 102. While he was running away, Dieffenbach slipped and fell to the ground, before getting to his feet and continuing on. *Id.* Officer Curtis also slipped, but managed to keep his footing. *Id.* Officer Curtis noted that the terrain was dangerous for a foot chase. *Id.* Officer Curtis eventually arrested Dieffenbach once he reached a fence that blocked escape. Dieffenbach did not immediately comply with police commands, though he did after a "few moments." *Id.* at 103. Officer Curtis did not have to "take him down," though he did have his taser drawn. *Id.*

After the incident, hospital medical staff documented C.K.'s injuries, which included bruising and swelling to her face, cuts inside of her mouth, a scrape on her knee, scrapes on her legs, soreness in her throat, which made it difficult to swallow, and general soreness throughout her body. *Id.* at 52-54.

On October 17, 2018, a jury convicted Dieffenbach of the above charges and additionally acquitted him of strangulation, criminal trespass, and one count of simple assault. On December 4, 2018, the trial court sentenced Dieffenbach to an aggregate term of two to ten years' incarceration, followed by five years' probation. On December 14, 2018, Dieffenbach filed a counseled motion for post-sentence relief and requested additional time to file supplemental post-sentence motions pending receipt of transcripts. The trial

court granted the request for additional time, and gave Dieffenbach until February 19, 2019 to file supplemental post-sentence motions, which the court ultimately denied on April 5, 2019. Dieffenbach timely appealed, and the trial court and Dieffenbach subsequently complied with Pa.R.A.P. 1925, wherein Dieffenbach, through counsel, alleged twenty-one instances of error.

On appeal, Dieffenbach presents the following three issues for our review:[7]

> (1) Whether the evidence, even when viewed in a light most favorable to the Commonwealth, was insufficient as a matter of law to establish [Dieffenbach's] guilt beyond a reasonable doubt regarding the offense of resisting arrest, as charged in Count 7 of the Criminal Information, since *inter alia*, the Commonwealth failed to establish that [Dieffenbach] engaged in conduct that either constituted "resistance," created a substantial risk of bodily injury to a public servant or required the public servant to utilize substantial force to overcome the resistance to satisfy all elements of § 5104 of the Pennsylvania Crimes Code[]?

> (2) Whether the evidence, even when viewed in a light most favorable to the Commonwealth, was insufficient as a matter of law to establish [Dieffenbach's] guilt beyond a reasonable doubt regarding the offense of burglary, as charged in Count 2 of the Criminal Information, since *inter alia*, the Commonwealth failed to establish that [Dieffenbach] possessed the "intent to commit a crime therein," before or at the time of entering the building, to sustain all elements of § 3502(a)(1)(ii)?

---

[7] Although this Court granted Dieffenbach three continuances to file his appellate brief, ordering that it be filed on or before January 22, 2020, Dieffenbach nonetheless filed it after that date, on February 19, 2020. In the interest of justice, we will consider his appeal on its merits.

(3)    Did the trial court err or abuse its discretion in concluding that the door had been open[ed] and allowing Officer Rinehimer to be called on rebuttal to testify that, after [***Mirandizing***[8]] [Dieffenbach], [Dieffenbach] refused to answer any questions, where the Commonwealth's discovery failed to disclose and the defense was not provided with a supplemental report that [Dieffenbach] ever declined to answer any questions, improperly disclosing to the jury that [Dieffenbach] exercised his constitutional right to remain silent and in violation of [his] rights under the Fifth Amendment of the United States Constitution?

Appellant's Brief, at 3.

Dieffenbach's first two claims challenge the sufficiency of the evidence supporting his burglary and resisting arrest convictions. Our standard of review for challenges to the sufficiency of the evidence is well-settled:

As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. The facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, the fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the

---

[8] ***See Miranda v. Arizona***, 384 U.S. 436 (1966).

presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

*Commonwealth v. Rahman*, 75 A.3d 497, 500-01 (Pa. Super. 2013)

(quoting *Commonwealth v. Pettyjohn*, 64 A.3d 1072 (Pa. Super. 2013))

(internal citations, quotation marks, and brackets omitted).

With regard to the crime of resisting arrest, our Supreme Court has

stated that:

[a] person commits a misdemeanor of the second degree if, with the intent of preventing a public servant from effecting a lawful arrest or discharging any other duty, the person creates a substantial risk of bodily injury to the public servant or anyone else, or employs means justifying or requiring substantial force to overcome the resistance.

*Commonwealth v. Jackson*, 924 A.2d 618, 620 (Pa. 2007) (citing 18

Pa.C.S.A. § 5104) (original emphasis omitted). Further, with regard to section

5104, we have previously stated that:

[t]he intent of this section is to confine the offense to forcible resistance that involves some substantial danger to the person. As a general rule, therefore, it is not criminal merely to flee arrest. *However, where the circumstances of the flight expose the pursuing officers to substantial danger a conviction for resisting arrest is proper.* The statute, it is clear, does not require the aggressive use of force such as a striking or kicking of the officer. A person resists arrest by conduct which 'creates a substantial risk of bodily injury' to the arresting officer or by conduct which justifies or requires 'substantial force to overcome the resistance.'

*Commonwealth v. Miller*, 475 A2d 145, 146 (Pa. Super. 1984) (internal

citations and quotation marks omitted; emphasis added). "Bodily injury" is

further defined as "[i]mpairment of physical condition or substantial pain." 18 Pa.C.S.A. § 2301. Moreover, we have previously stated that, "[t]he statute does not require serious bodily injury. Nor does it require actual injury to the arresting officer. Rather, sufficient resistance is established *if the arrestee's actions created a substantial risk of bodily injury to the arresting officer*." **Commonwealth v. Lyons**, 555 A.2d 920, 925 (Pa. Super. 1989) (emphasis added). **See also Commonwealth v. Butler**, 512 A.2d 667, 673 (Pa. Super. 1986).

With regard to his resisting arrest conviction, Dieffenbach claims that he:

> did not create, nor was [Officer Curtis] exposed, to a substantial risk of bodily injury as intended by the legislature. [Dieffenbach] did not fight and only fled through the woods. While [Officer Curtis] testified that, when proceeding through the woods, leaves lying on the rocks created a slippery condition, the risk that may have been present does not rise to the same level as the risk which existed in **Lyons** or **Miller**.
>
> While the area may have been slippery, Officer Curtis failed, aside from giving a general opinion, to describe the area or surface in detail, in other words, if he slipped or fell, would he sustain injury, because the entire area was rocky or, if he were to fall, would he fall on leaves, grass or rocks. That [Officer Curtis] held a generalized opinion that the area was dangerous, without further description does not provide facts which, beyond a reasonable doubt, established that a substantial risk of bodily injury existed.

Appellant's Brief, at 24.

At trial, Officer Curtis described the events that led to Dieffenbach's charge of resisting arrest as follows:

[By Commonwealth Attorney]:

- 9 -

Q. And when you encountered him at the back of the house, what was he doing?

A. He was running.

* * *

Q. When you saw him running, what did you do?

A. I pulled out my gun.

Q. And did you give him any commands?

A. Several commands to stop; police, stop, get down on the ground.

Q. Did he do so?

A. No, he did not. He immediately turned left. Right behind there's a wooded section, so he turned left and started to go into the woods.

Q. Can you describe for the jury what that terrain is like in the woods back there?

A. Well, what happened first off when he entered the woods, which I didn't know but I watched him do it, it stops, drops, levels out and continues down a hill like this. So his first couple of steps in he fell down and then he got up and continued to run down the hill and I followed him down.

Q. And did you also fall down that hill?

A. Not the first one because I saw him do it so I was able to get down without falling, but as we continued to run it was rock covered, leaf covered, there were fallen leaves and stuff like that, so eventually I slipped on that kind of stuff.

Q. In your over 20 years' experience as a police officer, would you have considered that terrain dangerous for a foot chase?

A. Yes.

Q. Is that because of the reasons you just described?

A. Yes.

Q. How did that chase end?

A. Well, as you get towards the bottom there's a fence, they have it all fenced in, so he came up to the fence.

Q. Could he have—was there any way around the fence without climbing over it?

A. Not there, no.

Q. So what did you do at that point?

A. As I got close to him, I pulled out my [t]aser and gave him commands to stop, get down on the ground, until he complied.

Q. And at this point did he comply?

A. Yeah.

Q. Did it take him a moment or two to comply?

A. Yes.

Q. Did you have to take him down?

A. No, I did not.

N.T. Trial, 10/16/18, at 101-03.

Here, although it is true that mere fleeing is not sufficient to constitute resisting arrest, upon review of the record, it is clear that Dieffenbach did not merely flee, but instead, *the circumstances of Dieffenbach's flight exposed Officer Curtis to substantial danger*. **See Miller**, **supra**; **see also Lyons**, **supra**. Officer Curtis testified that the terrain over which the foot chase took place was uneven, covered in rocks and leaves, and had a drop-off that was difficult to navigate, which Officer Curtis did not know about, and which he did not initially see. Indeed, Officer Curtis testified that the drop-off in the ground is what caused Dieffenbach to fall during the foot chase. Officer Curtis further testified that he did not fall because he was able to observe Dieffenbach navigate the drop-off first before attempting to traverse it, but that he too

slipped at some point during the chase. Officer Curtis also testified that, based on his over twenty years of experience as a police officer, he considered that terrain to be "dangerous" for a foot chase. Contrary to Dieffenbach's claims, Officer Curtis did not simply give a "generalized opinion that the area was dangerous." Appellant's Brief, at 24. Rather, Officer Curtis described with particularity the rocks, leaves, and terrain in a manner that the jury could conclude, that if Officer Curtis were to fall—as Dieffenbach did during the chase—Officer Curtis could have suffered "impairment of physical condition" or he could have endured "substantial pain." *See* 18 Pa.C.S.A. § 2301. Moreover, at trial, the jury viewed photographs of the terrain over which the foot chase took place. *See* N.T. Trial, 10/16/18, at 116-17. Accordingly, we conclude that the jury could find that Dieffenbach's "actions created a substantial risk of bodily injury" to Officer Curtis because both men were unable to navigate the terrain through which the foot chase took place without losing their footing. *See Miller*, *supra*. Therefore, each element of the crime of resisting arrest was proved beyond a reasonable doubt. *See Rahman*, *supra*.

Next, Dieffenbach challenges the sufficiency of the evidence with regard to his burglary conviction.

> A person commits the offense of burglary if, with the intent to commit a crime therein, the person . . . enters a building or occupied structure, or separately secured or occupied portion thereof that is adapted for overnight accommodations in which at the time of the offense any person is present.

18 Pa.C.S.A. § 3502(a)(1)(ii). With regard to the specific intent element of burglary, our Court has previously said that:

> [t]he intent to commit a crime after entry may be inferred from the circumstances surrounding the incident. While this intent may be inferred from actions as well as words, the actions must bear a reasonable relation to the commission of a crime. Once one has entered a private residence by criminal means, we can infer that the person intended a criminal purpose based upon the totality of the circumstances. The Commonwealth is not required to allege or prove what particular crime a defendant intended to commit after his forcible entry into the private residence.

*Commonwealth v. Lambert*, 795 A.2d 1010, 1022 (Pa. Super. 2002) (internal citations omitted). Additionally, burglary is complete at the moment of entry into an occupied structure with the intent to commit a crime therein:

> The crime of wilfully and maliciously breaking and entering any building with intent to commit any felony therein is completed when the felon breaks into the building either actually, or constructively by fraud, conspiracy or threats, with the intent above named. Consummation or execution of the intent to steal or to commit some other felony is not necessary to complete the crime of burglary . . . . Whatever felony is committed in the building broken into is separate and distinct from the offense of breaking and entering into that building.

*Commonwealth v. Tavarez*, 174 A.3d 7, 12 (Pa. Super. 2017) (quoting *Commonwealth ex rel. Moszczynski v. Ashe*, 21 A.2d 920, 921-22 (Pa. 1941)) (internal brackets and original emphasis omitted).

Dieffenbach claims that the Commonwealth failed to prove the specific intent element of burglary at trial. More specifically, he states that the trial court instructed the jury, during the jury charge, that the Commonwealth alleged there were three possible underlying crimes for the basis of his

burglary charge: (1) strangulation; (2) violation of the PFA; and (3) simple assault. Dieffenbach argues that: (1) the jury acquitted him of the strangulation charge,[9] so that crime cannot be the underlying intentional crime for burglary; (2) the legislature never intended for a PFA violation to be the underlying intentional crime for burglary; and (3) the evidence adduced at trial was insufficient to find Dieffenbach guilty of simple assault. Therefore, he asserts that simple assault cannot be the underlying intentional crime either. *See* Appellant's Brief, at 25-31. We disagree.

Our Supreme Court has previously stated that, with regard to burglary, there is no requirement that the Commonwealth allege that the defendant intended to commit *a particular* crime. **Commonwealth v. Alston**, 651 A.2d 1092, 1095 (Pa. 1994). The Court explained this point further in a footnote:

> [w]e conclude that the specific intent element of the crime of burglary is limited to whether the accused entered with a "general criminal intent" to commit any crime. Thus, an intent to commit a *particular* crime is not a material element of the offense of burglary under the law of this Commonwealth. To hold otherwise would require the Commonwealth to predict what crime Appellant intended to commit[.] Such a requirement would essentially eviscerate the Commonwealth's ability to prove the specific intent element of burglary based upon inference from the totality of the circumstances of Appellant's intrusion—a manner of proof to which the Commonwealth was clearly entitled.

*Id.* (emphasis in original). In addition, we have previously stated that "[w]hen the Commonwealth does specify, *in the information or indictment*, the crime

---

[9] The jury acquitted Dieffenbach of the strangulation charge and one count of simple assault, but, as discussed above, convicted Dieffenbach of one other count of simple assault.

- 14 -

defendant intended to commit, the Commonwealth must prove the requisite intent for that particular crime in order to prove a burglary or attempted burglary." **Commonwealth v. Brown**, 886 A.2d 256, 260 (Pa. Super. 2005) (emphasis added).

Here, the Commonwealth's information alleged in relevant part:

COUNT 2: Burglary - Overnight Accommodations; Person Present - (F1)

On or about: 09/06/2017      18 § 3502 §§ A1II

The [a]ctor did enter a building or occupied structure, or separately secured or occupied portion thereof that was adapted for overnight accommodations, namely, [] Newberry Estate, Dallas Borough, with the intent to commit a crime therein and there was an individual present at the time of entry.

Information, 3/16/18, at 1.  Thus, the Commonwealth did not allege the specific underlying crime for Dieffenbach's burglary charge in the information.[10]  Just as in **Alston**, the Commonwealth's information was not

---

[10] At trial, the court explained in its final jury charge:

The defendant has been charged with burglary.  To find the defendant guilty of this offense you must find that all of the following elements have been proven beyond a reasonable doubt: [f]irst, that the defendant entered the location at [] Newberry Estates in Dallas Borough[; s]econd, that the defendant entered that location with the intent to commit a crime inside. *And in this case the crimes that the Commonwealth alleges he intended to commit were criminal contempt or a PFA violation or strangulation or simple assault.*  And third, that the location was a building or occupied structure or a separately secured or occupied portion of a building or structure that is adapted for overnight

- 15 -

"constitutionally defective for failing to provide notice of that which need not have been alleged or proven." *See Alston*, *supra*, at 1095.

Here, we agree with the trial court that, when "[t]aken together, the early morning hour of [Dieffenbach's] entry into [C.K.'s] home, [Dieffenbach's] knowledge that the PFA prohibited him from entering the home, [Dieffenbach's] attack on [C.K.], and [Dieffenbach's] flight when confronted, all allowed the jury to reasonably infer [Dieffenbach] possessed the intent to commit a crime" at the time of his entry into C.K.'s home. Trial Court Opinion, 9/6/19, at 24. *See Lambert*, *supra*. *See also Commonwealth v. Hargrave*, 745 A.2d 20, 23 (Pa. Super. 2005) (holding that, "[f]light does indicate consciousness of guilt, and a trial court may consider this as evidence, 'along with other proof, from which guilt may be inferred.'"). Therefore, we conclude that the evidence was sufficient to prove all elements of Dieffenbach's burglary conviction beyond a reasonable doubt.[11] *See Rahman*, *supra*.

_____

accommodations in which at the time of the offense any person is present.

N.T. Trial, 10/16/18, at 248-49 (emphasis added). Because our decision in *Brown*, *supra*, stated that the Commonwealth must prove the specific intent, as stated *in the information or complaint*, we conclude that the trial court's misstatement to the jury regarding Dieffenbach's charges was harmless. *See Alston*, *supra* at 1094 n.3 ("an intent to commit a *particular* crime is not a material element of the offense of burglary under the law of this Commonwealth.").

[11] That Dieffenbach entered C.K.'s home before she returned from the bus stop is of no moment. "[T]he statutory words, 'individual is present at the

In his final claim on appeal, Dieffenbach argues that a new trial is warranted because: (1) the trial court erred when it admitted evidence of Dieffenbach's silence after he was *Mirandized*, which was a violation of Dieffenbach's right to remain silent pursuant to the Fifth Amendment of the United States Constitution; and (2) the prosecution failed to disclose to Dieffenbach that it could use his silence in rebuttal, a violation of the mandatory disclosure requirement of Pa.R.Crim.P. 573 (relating to pretrial discovery and inspection). *See* Appellant's Brief, at 31-42.

At trial, the court found that Dieffenbach's testimony attacked the thoroughness of the Commonwealth's investigation into his case, and that Dieffenbach opened the door to "fair response" by the Commonwealth. *See* Trial Court Opinion, 9/6/19, at 21-22. Dieffenbach's testimony on direct examination, which gave rise to Officer Rinehimer's rebuttal testimony, proceeded as follows:

[By Dieffenbach's Attorney:]

Q. And then when you came—were you taken into custody at that point?

A. Yes.

Q. And were you brought back around to the front of the house?

A. Yes.

---

time of entry' apply when an occupant or owner is actually present at the time of entry or enters the structure while the defendant is still inside the structure." *Commonwealth v. Rivera*, 983 A.2d 767, 760 (Pa. Super. 2009).

Q. Were there any requests that you made to the police?

A. She had said—[C.K.] had said that I had broken into the house. So I was going to be taken away. I didn't want somebody to smash a window or jimmy the lock or kick the door in as we were gone, so I had asked Officer Rinehimer to take pictures because there was nothing. There was nothing physically that said that I had broken into the house. I knew that she had invited me in. I knew that none of this had happened, so I had asked him so this wouldn't be an issue later. All somebody had to do was come along and smash the window after that and then it looks like I've broken in the house.

Q. And you heard Officer Rinehimer testify that you asked him to do that?

A. Yes, which I did.

Q. And were there any statements you made to the police at that point?

A. No.

Q. Did you tell the police about how you got in the house?

A. Other than him asking—I don't know if it was him or the chief— as we were at the station about whose baby it was, *no one to this day has asked me a question about anything.*

N.T. Trial, 10/16/18, at 160-61 (emphasis added). On cross-examination, the

Commonwealth gave Dieffenbach the opportunity to clarify his testimony:

[By Commonwealth Attorney:]

Q. And it was also your statement on direct examination that—I think you said to this day that no one has asked you what happened that day, correct? Was that your testimony on direct examination?

A. Yes.

*Id.* at 178. On rebuttal, the trial court permitted the Commonwealth to recall

Officer Rinehimer, in "fair response" to Dieffenbach's claims. Officer

Rinehimer's relevant testimony proceeded as follows:

By [Commonwealth Attorney]:

Q. Officer Rinehimer, as the affiant in this matter you were present for the defendant's testimony, correct?

A. Correct.

Q. *And did you hear him say that to this day no one has asked him his side of the story?*

A. *I did.*

Q. *Is that true?*

A. *No.*

Q. *Please tell the jury what you know about that.*

A. *After **Mirandizing** him and asking him a couple questions, I asked him to put it in his own words and he refused.*

***Id.*** at 187 (emphasis added).

Dieffenbach first claims that the trial court erred when it determined that the Commonwealth's reference to his post-arrest silence was "fair response." ***See*** Appellant's Brief, at 36-39. We disagree.

With regard to the right to remain silent, we have previously said that:

> Both the United States Constitution and the Pennsylvania Constitution protect a person from being compelled to be a witness against himself. Our cases have established and analyzed four distinct time periods during which a defendant may remain silent or offer a statement during the criminal process: (1) before arrest; (2) after arrest but before the warnings required by ***Miranda*** have been given; (3) after ***Miranda*** warnings have been given; and (4) at trial.

***Commonwealth v. Kuder***, 62 A.3d 1038, 1049 (Pa. Super. 2013) (internal citations, quotation marks, and footnote omitted). Further, with regard to a prosecutor's reference to a defendant's silence, our Supreme Court has stated:

- 19 -

[i]n general, after a defendant has been given *Miranda* warnings, the defendant's post-arrest silence may not be used against him to impeach an explanation subsequently offered at trial. However, *where a prosecutor's reference to a defendant's silence is a fair response to a claim made by defendant or his counsel at trial, there is no violation of the Fifth Amendment privilege against self-incrimination.* The protective shield of the Fifth Amendment may not be converted into a sword that cuts back on an area of legitimate inquiry and comment by the prosecutor on the relevant aspects of the defense case.

*Commonwealth v. Copenhefer*, 719 A.2d 242, 251 (Pa. 1988) (internal citations omitted; emphasis added).

In *Copenhefer*, our Supreme Court described a similar set of facts, where a defendant's testimony, which concerned answers given to police that were selectively non-responsive, gave rise to the prosecution's permissible use of his post-arrest silence as "fair response." *Id.* at 252. During the investigation of that case, police questioned the defendant concerning his whereabouts over a three-day period. At trial, the defendant testified that he fully cooperated with police, when, in fact, he had refused to answer questions regarding his whereabouts on one of the days:

In [his] testimony, appellant clearly states that he cooperated with the police because he had nothing to hide, and further insinuates that everything the police believed to be relevant—the 'whole list of questions'—was included in the conversation between appellant and the police. This testimonial assertion simply did not reflect the reality of appellant's selective non-responsiveness to certain highly relevant questions, and the prosecutor properly pointed this out by confronting appellant with his invocation of silence in response to the question[.] *Appellant may not assert to a jury that on the one hand he was entirely cooperative with investigators but on the other hand not place before that same jury the fact that he belatedly invoked his right to remain silent to refuse to answer the most incriminating questions put to him.* Not only would such a situation be

misleading to the factfinder, but it would allow appellant to convert the Fifth Amendment shield into a sword which could not be countered by the prosecutor's further inquiry or fair comment thereon.

*Id.* at 252 (quotation marks omitted; emphasis added).

Dieffenbach attempts to distinguish his case from ***Copenhefer*** by arguing that, "[u]nlike the appellant in [] ***Copenhefer***, here, Dieffenbach did not deny that he was asked questions and did not deny that he responded to those questions. Rather, he merely denied [*sic*] that, after he arrived at the stations, no one asked him anything further." Appellant's Brief, at 38. Restated, Dieffenbach argues that his testimony on direct examination was that he denied making statements once arriving back at the station, but that Officer Rinehimer's rebuttal testimony described Dieffenbach's silence at the scene of his arrest. ***Id.***

After reviewing the relevant testimony above, we conclude that Dieffenbach's testimony belies this alleged distinction. On direct examination, Dieffenbach stated in response to whether he told the police how he got in the house, that, "*[o]ther than [Officer Rinehimer] asking*—I don't know if it was him or the chief—as we were at the station about whose baby it was*, no one to this day has asked me a question about anything.*" N.T. Trial, 10/16/18, at 161 (emphasis added). Dieffenbach's mention of Officer Rinehimer's asking questions is clearly in reference to when Dieffenbach was still at the scene of the crime, when Officer Rinehimer questioned Dieffenbach after giving him ***Miranda*** warnings. Dieffenbach's testimony, therefore, was not solely confined to when he was brought to the police station.

Moreover, we conclude that the trial court did not err in finding that Officer Rinehimer's testimony was "fair response." Indeed, Dieffenbach's case is exactly like that of the defendant's in **_Copenhefer_**, insofar as each defendant questioned the thoroughness of the Commonwealth's investigation into his case; each stated that he was cooperative with investigators, yet, simultaneously invoked "his right to remain silent to refuse to answer the most incriminating questions put to him." **_See Copenhefer_**, **_supra_** at 252. Thus, the trial court did not err in allowing Officer Rinehimer to testify in rebuttal regarding Dieffenbach's post-arrest silence. **_Id._**

Finally, Dieffenbach argues that Pa.R.Crim.P. 573 provides for mandatory disclosures, and that rebuttal evidence is mandatory under the rule. **_See_** Appellant's Brief, at 41. Dieffenbach states that he never received a disclosure from the Commonwealth regarding its use of his silence in rebuttal, and consequently, he is entitled to a new trial. **_Id._** at 43. We disagree.

Pennsylvania Rule of Criminal Procedure 573 provides in relevant part:

**Rule 573. Pretrial Discovery and Inspection**

**(B)** Disclosure by the Commonwealth.

> **(1) _Mandatory._** In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.

\* \* \*

**(b)** any written confession or inculpatory statement, or the substance of any oral confession or inculpatory statement, and the identity of the person to whom the confession or inculpatory statement was made that is in the possession or control of the attorney for the Commonwealth;

\* \* \*

**(f)** any tangible objects, including documents, photographs, fingerprints, or other tangible evidence[.]

Pa.R.Crim.P. 573(B)(1)(b), (f).

Dieffenbach points to our decision in **Commonwealth v. Thiel**, 470 A.2d 145 (Pa. Super. 1983), and our Supreme Court's decision in **Commonwealth v. Ulen**, 650 A.2d 416 (Pa. 1994), for the proposition that:

> [i]t is true that we cannot expect the Commonwealth to anticipate the materiality of all possible rebuttal evidence. [W]e can imagine cases in which the materiality of certain evidence in the Commonwealth's possession might not become apparent until after trial has begun. On the other hand [former] Rule 305 (B)(1) makes no distinction between rebuttal evidence and evidence the Commonwealth expects to use in its case-in-chief. In cases where the prosecutor can reasonably predict possible defense strategies and evidence, he must also be held to reasonable anticipation of what evidence in his possession might be material in rebuttal.

Appellant's Brief, at 41. Finally, Dieffenbach cites to our Supreme Court's decision in **Commonwealth v. Moose**, 602 A.2d 1265 (Pa. 1992), where the Court stated that "[t]he purpose of the discovery rules is to permit the parties in a criminal matter to be prepared for trial. Trial by ambush is contrary to the spirit and letter of those rules[.]" **Id.** at 1274.

Here, it is not clear to us what evidence was "in the Commonwealth's possession," under these circumstances, that was not also in Dieffenbach's

possession. *See Ulen*, *supra*; *see also* Pa.R.Crim.P. 573(B)(1)(b). The Commonwealth merely was aware, *as was Dieffenbach*, that Dieffenbach invoked his right to remain silent once Officer Rinehimer read him his *Miranda* warnings. Our review of the cases to which Dieffenbach cites reveals a common thread that warranted reversal: the Commonwealth's failure to disclose "tangible" evidence, *see* Pa.R.Crim.P. 573(B)(1)(f), that was actually in its possession. *See, e.g., Ulen*, *supra* (Commonwealth failed to disclose tape of recorded conversation in its possession); *Moose*, *supra* (Commonwealth failed to disclose defendant's incriminating statements in its possession); *Commonwealth v. Jenkins*, 383 A.2d 195 (Pa. 1978) (Commonwealth failed to disclose, and denied existence of, report in its possession); *Commonwealth v. Jackson*, 319 A.2d 161 (Pa. 1974) (Commonwealth refused to disclose list of names of witnesses it intended to produce that placed defendant at scene of crime); *Commonwealth v. Hanford*, 937 A.2d 1094 (Pa. Super. 2007) (Commonwealth failed to disclose recording of defense witness in its possession); *Thiel*, *supra* (Commonwealth failed to disclose two airplane tickets in its possession). Here, because knowledge of Dieffenbach's post-arrest silence was not solely in the Commonwealth's "possession," and because there was nothing "tangible" for the Commonwealth to turn over, there was no violation of Rule 573. *See* Pa.R.Crim.P. 573(B)(1)(b), (f). Moreover, there was no unfair surprise or "trial by ambush," since Dieffenbach was aware that he invoked his Fifth Amendment right to remain silent at the scene. *See Moose*, *supra*; *see also*

***Ulen***, ***supra***.   Consequently, we conclude that Dieffenbach is not entitled to a new trial on these grounds.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 07/29/2020